1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - -x

5   In the Matters of:

6   SOUNDVIEW ELITE LTD. et al.,            Case No. 13-13098-reg

7             Debtors.

8   - - - - - - - - - - - - - - - - - -x

9   FLETCHER INTERNATIONAL, LTD. et al.,    Case No. 12-12796-reg

10            Debtors.

11  - - - - - - - - - - - - - - - - - -x

12  FLETCHER LEVERAGED FUND

13  (IN LIQUIDATION)                        Case No. 14-10093-reg

14            Debtor.

15  - - - - - - - - - - - - - - - - - -x

16  FLETCHER INCOME ARBITRAGE FUND,

17  (IN LIQUIDATION)                        Case No. 14-10094-reg

18            Debtor.

19  - - - - - - - - - - - - - - - - - -x

20

21

22

23

24

25

16                United States Bankruptcy Court

17                One Bowling Green

18                New York, New York

20                February 25, 2014

21                9:54 AM

23  B E F O R E:

24  HON. ROBERT E. GERBER

25  U.S. BANKRUPTCY JUDGE

```
 1
 2   13-13098-reg
 3   1) Motion Filed by the Trustee for (A) an Order Authorizing
 4   Bankruptcy Rule 2004 Discovery and (B) a Uniform Protective
 5   Order
 6
 7   2) Status Conference
 8
 9   12-12796-reg
10   1) Status Conference
11
12   14-10093-reg
13   1) Recognition Hearing
14
15   14-10094-reg
16   1) Recognition Hearing
17
18
19
20   Transcribed by:  Penina Wolicki
21   eScribers, LLC
22   700 West 192nd Street, Suite #607
23   New York, NY 10040
24   (973)406-2250
25   operations@escribers.net
```

1

2  A P P E A R A N C E S :

3  PORZIO BRONBERG & NEWMAN P.C.

4        Attorneys for Soundview Debtors-out-of-Possession

5        100 Southgate Parkway

6        Morristown, NJ 07962

7

8  BY:  TERRI JANE FREEDMAN, ESQ.

9        WARREN MARTIN, ESQ. (TELEPHONICALLY)

10

11

12  JONES DAY

13        Proposed Counsel for Soundview Trustee, Corinne Ball

14        222 East 41st Street

15        New York, NY 10017

16

17  BY:  LAUREN M. BUONOME, ESQ.

18        STEPHEN PEARSON, ESQ.  (TELEPHONICALLY)

19        CORINNE BALL, ESQ., TRUSTEE

20

21

22

23

24

25

5

1

2  LUSKIN, STERN & EISLER LLP

3         Attorneys for Richard Davis, FILB Chapter 11 Trustee

4         Eleven Times Square

5         New York, NY 10036

6

7  BY:   MICHAEL LUSKIN, ESQ.

8

9

10  UNITED STATES DEPARTMENT OF JUSTICE

11         Office of the United States Trustee

12         201 Varick Street

13         Suite 1006

14         New York, NY 10014

15

16  BY:   RICHARD C. MORRISSEY, ESQ.

17

18

19  MORRISON & FOERSTER LLP

20         Attorneys for Joint Official Liquidators

21         1290 Avenue of the Americas

22         New York, NY 10104

23

24  BY:   JOHN A. PINTARELLI, ESQ.

25

1

2   SATTERLEE STEPHENS BURKE & BURKE LLP

3       Attorneys for Fletcher Income Arbitrage Fund

4       and FIA Leveraged Fund

5       230 Park Avenue

6       Suite 1130

7       New York, NY 10169

8

9   BY:   TIMOTHY T. BROCK, ESQ.

10

11

12   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

13       Attorneys for Pasig Ltd.

14       1633 Broadway

15       New York, NY 10019

16

17   BY:   JEFFREY R. GLEIT, ESQ.

18       ANDREW K. GLENN, ESQ.

19

20

21

22

23

24

25

```
 1
 2   OSTAD PLLC
 3         Attorneys for BVI creditors
 4         185 Great Neck Road
 5         Suite 330
 6         Great Neck, NY 11021
 7
 8   BY:   KAREN OSTAD, ESQ. (TELEPHONICALLY)
 9
10
11   ALSO PRESENT:  (TELEPHONICALLY)
12         ALPHONSE FLETCHER, Fletcher Asset Management
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                     P R O C E E D I N G S

2           THE COURT:  Soundview Elite and Fletcher, I'm going to

3   hear them both at the same time.

4           I know many of you, but I don't know you all, so I

5   would like people to introduce themselves, if they think that

6   they may wish to be heard today.

7           Yes, good morning.

8           MS. BUONOME:  Your Honor, good morning.  Lauren

9   Buonome of Jones --

10          THE COURT:  I'm sorry, I couldn't hear you.  You want

11  to come to one or another of the mics, please.

12          MS. BUONOME:  Of course.  Good morning, Your Honor.

13  Lauren Buonome, of Jones Day, proposed counsel to Ms. Corinne

14  Ball, as Chapter 11 trustee of the Soundview debtors.

15          THE COURT:  Okay, thank you.

16          I see you have your trustee next to you, Ms. Buonome.

17          MS. BUONOME:  Pardon me, Your Honor.  I'd like to

18  introduce Ms. Corinne Ball.  As well, Your Honor, we have two

19  of our colleagues on the line at Jones Day's London office.

20  And I'd like to introduce --

21          THE COURT:  The London office?

22          MS. BUONOME:  Yes, Your Honor.  They're involved with

23  our offshore disputes team, and have been directly involved in

24  negotiating the protocol with the joint official liquidators.

25  Mr. Stephen Pearson is on the line, and Mr. Barnaby Stueck is

1   on the line.  They're Cayman-qualified practicing Cayman

2   lawyers.

3           THE COURT:  Okay.

4           MS. BUONOME:  Thank you.

5           THE COURT:  Thank you.  Mr. Glenn?

6           MR. GLENN:  Good morning, Your Honor.  Andrew Glenn;

7   Kasowitz, Benson, Torres & Friedman, on behalf of creditor

8   Pasig Ltd., joined by my colleague Jeffrey Gleit.

9           THE COURT:  All right.

10          MR. PINTARELLI:  Your Honor, John Pintarelli of

11  Morrison & Foerster, for the joint official liquidators.

12          THE COURT:  Right, Mr. Pintarelli.

13          MR. MORRISSEY:  Richard Morrissey for the U.S.

14  Trustee.

15          THE COURT:  Right.

16          MS. FREEDMAN:  Terri Jane Freedman, Porzio Bromberg &

17  Newman, on behalf of the debtors-out-of-possession.

18          THE COURT:  Right.  Last name was Freedman, if I heard

19  you right?

20          MS. FREEDMAN:  Freedman, correct.

21          THE COURT:  Yes, thank you.

22          MR. BROCK:  Good morning, Your Honor.  Timothy Brock

23  from Satterlee Stephens Burke & Burke on behalf of the JOLs for

24  Leveraged and Arbitrage.

25          THE COURT:  Okay.  Now, you're shifting, Mr. Brock,

1   from the Soundview case over to the Fletcher case, as I had

2   asked -- the FILB case -- the Fletcher International case?

3           MR. BROCK:  I don't intend to say anything during this

4   hearing, Your Honor.  And if you're not going to take the

5   Arbitrage matters up in this session, I will go --

6           THE COURT:  No, you were right to step up, Mr. Brock.

7   But I had done a pause for a second, because I remembered you

8   from the FILB case, but not from the Soundview case.  And I had

9   called both cases up.  I'm just trying to get things straight.

10          MR. BROCK:  It's the FILB case, Your Honor.

11          THE COURT:  Yeah, okay.  That's fine.  That's fine.

12          Mr. Luskin?

13          MR. LUSKIN:  Good morning, Your Honor.  Michael

14  Luskin; Luskin, Stern & Eisler, for Richard Davis, who is the

15  Chapter 11 trustee in the FILB.  And I don't know that I'll be

16  participating in these two cases, but I'm here for both

17  Soundview and the Chapter 15s.

18          THE COURT:  Okay.

19          MR. TURNER:  Good morning.  Good morning, Your Honor.

20  Stuart Turner, pro se.  I filed objections in the FILB, FIA

21  Leveraged Fund, and Fletcher Income Arbitrage Fund, Ltd. cases.

22  I'm not planning on saying anything.

23          THE COURT:  Okay, Mr. Turner.

24          All right.

25          MR. MARTIN:  Your Honor?

1           THE COURT:  Yes, who's speaking, please.

2           MR. MARTIN:  It's quiet in the airport for a moment,

3   so I've taken it off mute just to announce myself, and then

4   I'll put it back on mute.  Warren Martin, Porzio Bromberg &

5   Newman, attorneys for the debtor-out-of-possession.  And you

6   have Ms. Freedman in the courtroom.  Thank you.

7           THE COURT:  Okay, thank you, Mr. Martin.

8           All right.  I have --

9           MS. OSTAD:  Good morning, Your Honor.  Karen Ostad,

10   representing three of the BVI entity creditors, also on the

11   phone.

12           THE COURT:  Okay, Ms. Ostad.

13           I have a variety of matters in both Soundview and

14   FILB -- FILB being Fletcher International Limited of Bermuda.

15   And I don't know the extent to which I need to take the two

16   cases together.  My sense is that we just have a status

17   conference in Fletcher International, in contrast to having a

18   more extensive hearing today -- Mr. Luskin, you want to just

19   step up for a minute and give me an update on FILB, Fletcher

20   International of Bermuda, and then advise me whether we can put

21   FILB off to the side and focus on Soundview?

22           MR. LUSKIN:  Yes, Your Honor.  One second.

23           Your Honor, Michael Luskin for the Chapter 11 trustee,

24   Richard Davis.  The cases, you'll recall, back some months ago,

25   Your Honor issued an order approving the disclosure statement.

1    That's gone out.  It had objection and voting deadlines which

2    have passed for all but two parties which I'll speak of in a

3    second.

4            We've had one objection from Mr. Turner and we've had

5    all ballots in except for three parties who are getting

6    extensions.  The --

7            THE COURT:  Extensions to vote, to object to

8    confirmation --

9            MR. LUSKIN:  Extensions --

10           THE COURT:  -- or both?

11           MR. LUSKIN:  Extensions for them to vote.  And Your

12   Honor, the confirmation hearing is going to be put off from

13   March 5th to March 27th.  That's at the request of the

14   Soundview trustee, who, as you know, is new to the case and has

15   really just gotten off the ground on her investigation.  I'm

16   sure you'll hear a lot more about that.

17           And what we have done, just jumping ahead, is we've

18   checked with chambers.  We've gotten the March 27th hearing

19   date.  We have a new objection date for the Soundview trustee

20   and also for the BVI entities that are represented by Ms.

21   Ostad.  Their objection deadline is now the 21st.  Their voting

22   deadline is the 21st.  And the voting deadline for the MBTA has

23   also been extended without --

24           THE COURT:  Forgive me, Mr. Luskin.

25           MR. LUSKIN:  Yes.

1          THE COURT:  The acronyms are throwing me.

2          MR. LUSKIN:  The MBTA is the Massachusetts public

3    pension fund that's an investor in FILB.  And due to scheduling

4    for their board meeting to approve the ballot, we had to give

5    them an extension.  So they have an extension also.

6          THE COURT:  Okay.

7          MR. LUSKIN:  It is our hope that during the next two

8    weeks we'll be able to continue our meetings with the Soundview

9    trustee and the Jones Day firm and their financial advisors,

10   Kinetics, who are here today.  The financial advisors -- their

11   financial advisors and our financial advisors have met and

12   exchanged some documents.  That continues.

13          So it is our hope that we will continue to have a

14   largely, if not entirely, consensual plan to present to the

15   Court on confirmation.

16          Meanwhile, in addition to confirmation, we've got

17   various settlements and asset sales which continue to progress.

18   I don't really have anything concrete to report to Your Honor

19   today, although actually, I think some of the settlements have

20   been presented to the Court for approval.  Basically with the

21   unsecured creditors at FILB, we've reached a number of

22   settlements.  And we're also in the midst of negotiations with

23   some of the parties identified in the trustee's report as

24   potential defendants in litigations.

25          Your Honor, if I might approach, I have a proposed

1   order extending the voting deadline and the objection deadlines

2   for the Soundview and BVI trustees and the voting deadline for

3   the MBTA.  I'd like to just hand it up.  I will e-mail it to

4   chambers later.  I just wanted --

5           THE COURT:  Why don't you give the hard copy to one of

6   my law clerks.

7           MR. LUSKIN:  Will do.

8           THE COURT:  E-mail the word processing version of it

9   to my chambers.  I take it, it is purely procedural and timing-

10  wise, and in any event, you've already vetted it with the other

11  stakeholders in the case?

12          MR. LUSKIN:  Correct.

13          THE COURT:  Okay, that'll be fine.  When we get off

14  the bench, whatever time that is, I'll look at the form of the

15  order, and assuming it's as you say it is, it'll be entered.

16          MR. LUSKIN:  Okay, thank you, Your Honor.

17          And then on -- just in terms of the matters on the

18  calendar; Soundview, again, as I said earlier, I don't think

19  I'm going to be called on to state a position in anything.  And

20  on the Chapter 15s, I'll -- we support those petitions.  And to

21  the extent I'm needed, I'm here.

22          THE COURT:  Okay.  You will be staying, then?

23          MR. LUSKIN:  I'm staying.  Absolutely, Your Honor.

24  Yes.

25          THE COURT:  Okay.  All right, then let's talk to

1   Soundview.

2           As I understand it, I have a 2004, which I wanted to

3   give people a chance to be heard in opposition on after the

4   filing of the actual motion that's required, which opportunity

5   has now been granted, and I'm not aware of any objections.  But

6   I wonder if an update on status in Soundview would be

7   productive before I just go over the 2004?

8           MS. BUONOME:  Sure.  Yes, of course, Your Honor.

9   Again, Lauren Buonome of Jones Day, proposed counsel of Ms.

10  Corinne Ball, Chapter 11 trustee of the Soundview debtors.

11          And yes, Your Honor, we'd be glad to provide a status

12  update today in connection with our progress in the past

13  approximate three weeks of being involved, following Your

14  Honor's order appointing Ms. Ball as the Chapter 11 trustee on

15  February the 3rd.

16          Again, I'd like to mention to the Court that Ms. Ball

17  is here in the courtroom.  Our proposed financial advisor,

18  Kinetic Partners, and Mr. Geoff Varga, on behalf of Kinetic

19  Partners is here today.  And again, to reiterate, Mr. Stephen

20  Pearson and Mr. Barnaby Stueck are on the line as our Cayman

21  experts from Jones Day's London office.

22          THE COURT:  Continue, please Ms. Buonome.

23          MS. BUONOME:  Just to begin, Your Honor, I'd like to

24  provide you with a roadmap of what I wanted to say today and

25  discuss matters generally.  The first is that we've had

1   substantial progress in just this short three-week period since

2   the trustee has been appointed.  Yet, the trustee, Ms. Corinne

3   Ball, as Mr. Luskin recognized before, Your Honor, in his

4   notice of adjournment of certain relevant and critical

5   deadlines related to the Fletcher International bankruptcy case

6   that is colloquially referred to as the FILB case, and their

7   impact on the Soundview debtors as well as the BVI funds.  That

8   impact has been viewed by Ms. Ball to create a predetermined

9   stake of interfund issues between the Soundview debtors, the

10   FILB debtor and other Fletcher-related funds, those funds being

11   Leveraged, Alpha and Arbitrage.

12        So I'd just like to make the Court aware that we are

13   pleased in consultation with Mr. Luskin, counsel to Mr. Davis,

14   and as well, with Ms. Ostad, who's on the line, counsel to Ms.

15   Midanek, the sole director of the BVI funds, that we've been

16   able to receive a small extension of approximately three weeks

17   to allow Ms. Ball as well as Ms. Midanek to assess and analyze

18   the impact of these interfund issues presented by the FILB

19   Chapter 11 plan.

20        We understand, and we've heard today, that Mr. Luskin

21   has cleared the relevant dates with Your Honor and the court

22   and has submitted the proposed modification of those certain

23   dates.  And again, to reiterate, the adjournment will be for

24   the FILB confirmation hearing to be moved from March 4 to March

25   27, as well as to allow both the Soundview debtors and the BVI

1  entities an extension of objection deadlines and voting

2  deadlines with respect to the FILB plan.

3          THE COURT:  To March 21, if I heard him correctly?

4          MS. BUONOME:  March 21 at noon.  That's correct, Your

5  Honor.

6          THE COURT:  Go on.

7          MS. BUONOME:  So what's next?  Well, the trustee has

8  comprised and created a very comprehensive work plan that's

9  broken down into three critical phases.  And I'm happy to

10  report that phase 1, which we've styled as the phase to secure

11  books, assets and records, is almost complete.  We've sent

12  letters to over eighty parties that we know about asking to

13  turn over documents and retain documents.  We've spoken with

14  key parties in the past three weeks.  And we've received

15  helpful feedback and are in the process of collecting and

16  reviewing those records.

17          In addition, as a housekeeping matter, Your Honor, the

18  trustee has opened court-authorized bank accounts and has

19  received the first 12.7 million dollars of U.S. funds into her

20  bank accounts yesterday, and estimates that the remaining

21  non-U.S. denominations in euro and Swiss francs, to arrive to

22  her bank accounts today.

23          THE COURT:  Pause, please, Ms. Buonome.

24          MS. BUONOME:  Sure.

25          THE COURT:  Is that the money that was previously held

1  at Wilmington Trust?

2          MS. BUONOME:  That's correct, Your Honor.  That's the

3  money previously held at Wilmington Trust and was transferred

4  pursuant to Your Honor's so ordered stipulation.

5          THE COURT:  To what extent is that all of the

6  Wilmington Trust money?

7          MS. BUONOME:  To our knowledge, Your Honor, that's the

8  full amount of the money in the Wilmington Trust -- that

9  Wilmington Trust holds on behalf of the Soundview debtors --

10  will be, we hope, as of today, fully transferred to the

11  trustee's bank accounts.

12          As we understand, yes, besides the Soundview debtors,

13  Wilmington Trust holds other accounts for non-Soundview

14  debtors.

15          THE COURT:  Continue, please.

16          MS. BUONOME:  Thank you.  So that's phase 1, securing

17  books, assets, records, and meeting with key parties.

18          Phase 2, which we've styled as the negotiation of the

19  protocol with the joint official liquidators in the Cayman

20  Islands and their U.S. counsel, as well as the analysis of

21  certain inter-fund issues that I'd highlighted previously to

22  Your Honor, that the FILB plan impacts -- that is impacted by

23  the FILB plan.

24          That phase, phase 2, is well underway.  In connection

25  with this phase, Mr. Geoff Varga of Kinetic Partners, has

1    identified it, as the trustee's proposed financial advisor, and

2    will play an integral role in analyzing and assisting the

3    trustee to assess these inter-fund issues that are created by

4    the predetermined FILB plan.

5            In addition to negotiating -- and as well, I should

6    note, the trustee's negotiation of the protocol with the joint

7    official liquidators of the Soundview debtors is designed to

8    maximize the returns to stakeholders in the shortest period

9    possible and address the trustee's concern that broad-brush

10   delineations along jurisdictional boundaries might be

11   counterproductive, given cost concerns.

12           We'd also like to reiterate points raised by Your

13   Honor's January 23rd, bench decision that the majority of the

14   assets and records are, indeed, located here in the United

15   States.  And therefore, it makes practical common sense to have

16   U.S. counsel liaising on behalf of those matters and issues.

17           The next component to the second phase, as I had

18   mentioned, is this inter-fund analysis.  The trustee hopes to

19   achieve forward progress vis-a-vis the FILB estate and other

20   related Fletcher funds -- and to remind, Your Honor, that's

21   Leveraged, Arbitrage and Alpha -- in an aim to maximize value

22   for the Soundview estates while at the same time preserving the

23   estates' defenses and minimizing their liabilities.

24           Your Honor, I will transition now to phase 3 but

25   remind Your Honor, that we can provide a more fulsome

1    description of our progress on the joint protocol later on in

2    the status conference and that description can come directly

3    from the attorneys working to negotiate that very protocol.

4           But I'd like to transition to phase 3 at this point

5    and note that the results of phase 2 precedes phase 3 may

6    materially impact the recoveries of the Soundview investors,

7    that's the analysis of those inter-fund issues raised by the

8    FILB plan.  And this inter-fund analysis, while it --

9           THE COURT:  Wait.  Did you regard the analysis of the

10   inter-fund issues as a phase 2 matter or as a phase 3 matter?

11          MS. BUONOME:  I'm sorry, Your Honor.  There's a little

12   bit of overlap.  It's definitely a phase 2 matter.  And that

13   has already begun.  And we're --

14          THE COURT:  That's what I had understood.  But then

15   what is phase 3?

16          MS. BUONOME:  So there's a bridge.  The inter-fund

17   analysis will serve as almost a bridge to phase 3.  And that's

18   the true investigation and recovery for the benefit of the

19   Soundview debtors.

20          As we've told the known constituents that the trustee

21   has been in communication with, and that's Mr. Glenn on behalf

22   of Pasig as well as Ms. Ostad on behalf of the BVI funds, we

23   will work in consultation with these parties and other, of

24   course, known constituents, to receive input and guidance in

25   the investigation process.  And in addition, the trustee's very

1  cognizant of the issues raised by Your Honor's January 23rd

2  bench decision, where Your Honor found cause under Sections

3  1104(a)(1) and 1104(a)(2), to necessitate such an in-depth

4  investigation.

5          So there are the three phases for Your Honor.  And

6  we're happy to report that this has been significant progress.

7          But notwithstanding the significant progress and the

8  momentum that has been gained by Ms. Corinne Ball since her

9  appointment approximately three weeks ago as the person -- to

10 borrow Your Honor's words, "the captain of the ship", we're

11 still facing some real challenges, as Your Honor may be aware.

12 Indeed, the Trustee has attempted to address all potential

13 known constituents in the cases, and by constituents I refer to

14 parties represented by counsel at this time.  But as Your Honor

15 may know we're still investigating and attempting to find out

16 the representatives for other investors and there were a

17 significant number, I believe fifty other investors to the

18 Soundview debtors.

19         On that note, I would like to segue to the letter

20 filed by Mr. Glenn on Thursday, February 20th at docket 190

21 which requests the United States Trustee, Mr. Morrissey to

22 convene a meeting of creditors to elect a new Chapter 11

23 trustee.  As indicated in the trustee's response to Mr. Glenn's

24 letter on February 21 at docket 195, the trustee is in

25 possession of stale and conflicting information regarding

1  Pasig's holdings.  If Your Honor would like, I could provide a

2  brief summary of the data points that reveal such conflicting

3  information.

4          THE COURT:  Pause, please.  No, not just because I

5  have a full courtroom.

6          MS. BUONOME:  Sure.

7          THE COURT:  But because I see this is an issue to be

8  managed by the U.S. Trustee Program --

9          MS. BUONOME:  Understand.

10         THE COURT:  -- until and unless somebody thinks the

11  U.S. Trustee Program hasn't done the job properly.

12         I do want to give everybody who wants to speak to

13  status, the opportunity but unless somebody brings a legal

14  principle to my attention that I'm not aware of now, I think I

15  should be staying my hand to let the U.S. Trustee Program do

16  its job and see if anybody believes the U.S. Trustee Program

17  hasn't done it properly.  I don't want to put a sock in your

18  mouth but that's the way I see it right now.

19         MS. BUONOME:  No problem, Your Honor.  And to further

20  an update of the status conference, we would like to reiterate

21  that we have made efforts to assure -- and we've been in

22  communication with Mr. Glenn, both prior to his letter and

23  following his letter, in an attempt to address his concerns

24  which the trustee viewed as primarily cost-based and we

25  understand that the U.S. Trustee has also been in communication

1    with Mr. Glenn for reasons that are slightly different such

2    that Mr. Glenn may have been left out of the protocol

3    negotiating process.

4         So notwithstanding the trustee's efforts to encompass

5    and incorporate the views of all known constituents, we were

6    slightly confused to receive Mr. Glenn's letter or a copy of it

7    on March -- pardon, on February 20th because it came actually

8    on the heels of a lengthy teleconference -- the trustee, her

9    counsel, proposed financial advisor, as well as counsel -- Ms.

10   Ostad, counsel to Deborah Midanek and Mr. Glenn had that very

11   Thursday morning regarding the status of the Soundview cases

12   and was also followed by on Friday, a very detailed letter

13   setting forth details on the same.

14        As kind of a matter related to this issue that has

15   arisen in the recent past in the cases, we wanted to advise

16   Your Honor that the trustee has yet to file certain retention

17   applications for certain professionals in an effort to avoid

18   cluttering the Court's docket until we have further clarity and

19   perhaps a resolution to Mr. Glenn's request to elect a Chapter

20   11 trustee.

21        THE COURT:  Pause.  You said certain professionals.

22   Did that include the retention of your firm?

23        MS. BUONOME:  It was separate and apart from that.  It

24   included the retention firm -- the retention of the Kinetic

25   Partners firm, as well as the claims and noticing agent that

1   we've solicited given -- and solicited among numerous other --
2   I guess three other proposals to ensure that we have selected
3   the most cost-effective claims and noticing agent that will
4   play a dual role of a document vending -- document host vendor.
5           THE COURT:  I am confused.  What motions for approval
6   of retention have already been filed?  What motions have been
7   filed but will be put on hold?  And what motions are coming
8   down the pike?  How many professionals are we talking about all
9   tolled?
10          MS. BUONOME:  Okay.  Well, Your Honor, we've only
11  filed one retention motion at all and so the other --
12          THE COURT:  That being for your firm, for Jones Day?
13          MS. BUONOME:  That's just for the Jones Day firm.
14  Correct, Your Honor.
15          THE COURT:  Okay.  And has that been vetted with the
16  U.S. Trustee Program?
17          MS. BUONOME:  Your Honor, we are in communication with
18  Mr. Morrissey in connection with our retention at this moment;
19  yes, Your Honor.
20          THE COURT:  I beg your pardon?
21          MS. BUONOME:  Yes.  We're in communication with Mr.
22  Morrissey, the United States Trustee in connection with Jones
23  Day's retention and are very aware of the cost concerns raised
24  by both Mr. Morrissey and other constituents in the case.
25          THE COURT:  Continue, please.

1      MS. BUONOME:  And so just to close the loop on Your

2  Honor's question, we have other retention applications yet to

3  be filed and have raised those retention-related matters with

4  Mr. Morrissey as well, notifying him that we will hold off on

5  filing until we've resolved this issue with respect to Mr.

6  Glenn's February 20th letter.

7      THE COURT:  Um-hum.

8      MS. BUONOME:  And then the final issue, Your Honor,

9  that I would or status update, if you will, that I would like

10  to bring to the Court's attention is the appeal filed by Mr.

11  Fletcher and Mr. Ladner to Your Honor's January 23rd bench

12  decision.  And Mr. Fletcher and Mr. Ladner filed their

13  designation of record last Friday, February 21st at docket 194.

14      We've also been in communication with Mr. Morrissey,

15  the United States Trustee's Program, on this point and pursuant

16  to those conversations, we believe that Mr. Morrissey who is

17  here in the courtroom today, would like the opportunity to

18  address this matter at today's hearing.

19      THE COURT:  Address which matter?

20      MS. BUONOME:  I'm sorry, Your Honor; the appeal from

21  Mr. Fletcher and Mr. Ladner of the Court's January 23rd bench

22  decision.

23      THE COURT:  Okay.  I haven't been elevated to the

24  district court yet.

25      MS. BUONOME:  I understand that, Your Honor.

SOUNDVIEW ELITE LTD, ET AL.; FLETCHER                    26

1        THE COURT:  All right.  As I said, everybody is going

2   to get a chance to be heard today.

3        MS. BUONOME:  Thank you.  And so at this time, I would

4   like to offer the opportunity to turn over the podium via

5   teleconference to my colleagues in London.

6        THE COURT:  Is that you, Mr. Pearson?

7        MR. PEARSON:  Yes, Your Honor.  Apologies for not

8   being there in the courtroom today.  I know it's somewhat

9   irritating to have voices on the phone rather than people

10  standing in front of you.

11       THE COURT:  I have no problems with you not making a

12  trip to the United States, Mr. Pearson.  I would like you to

13  speak a little more loudly, please.

14       MR. PEARSON:  Of course, Your Honor.  I am actually

15  admitted to practice in the Southern District, so I usually am

16  in New York but I had pre-existing commitments, unfortunately,

17  this week in London which took me away from the City.

18       My colleague asked me just to update you as to the

19  protocol situation.  We've been in very constructive and

20  collaborative discussions from the very first day that Ms. Ball

21  was appointed with the JOLs in Cayman and we've involved

22  Barnaby Stueck, my partner who is Cayman-qualified, in those

23  discussions to try and make them as effective as possible.  And

24  we've involved Geoff Varga, the proposed financial advisor, on

25  the basis that he was the person who was responsible for

1   negotiating the Lancelot protocol.  He was the JOL of Lancelot

2   in that case and so he brings --

3           THE COURT:  Pause, please.  It's partly the acoustics

4   and partly because I'm not used to English accent.

5           MR. PEARSON:  I'll try and improve --

6           THE COURT:  Did you say that your colleague, Mr. Silk

7   (sic) had negotiated the Lancelot protocol in the Lancelot

8   case?

9           MR. PEARSON:  That's partially right; Mr. Varga, who

10  is in the courtroom with you, who is the proposed financial

11  advisor, he negotiated the Lancelot protocol in the Lancelot

12  case.

13          THE COURT:  I see.

14          MR. PEARSON:  So he has invaluable experience from

15  that matter of getting these things across the line and Mr.

16  Stueck, who is with me in London today, is a Cayman-qualified

17  lawyer and so he's obviously another helpful person in terms of

18  negotiating and concluding a protocol which has to address the

19  U.S. law and Cayman law.

20          We had a constructive discussion.  We allowed the JOLs

21  to come up with an initial draft protocol proposal which was

22  sent on the 11th of February.  We considered that and there

23  were aspects of it that concerned us in that they seemed to

24  depart quite a lot from what Lancelot had provided for.  In

25  particular, Lancelot -- it was clear from Lancelot that the

1  U.S. Trustee was really going to be the captain of the ship and

2  have residual control over claims investigations and deciding

3  what was kept in the U.S. and what was farmed out to Cayman.

4  And the protocol that we got back in draft from the JOLs

5  departed somewhat from that and sought to allocate a lot of

6  responsibility to the JOLs in Cayman.

7       And so what we did was we didn't trade markups.  We

8  didn't get involved in expensive amendment processes.  We went

9  back with some short counterproposals which adopted a more

10 surgical approach.  We looked at the tasks.  We looked at the

11 potential claims.  We looked at the jobs.  And we said why

12 don't we try and allocate these efficiently, so they can be

13 done as fast as possible.

14       THE COURT:  Why don't we do what?

15       MR. PEARSON:  Why don't we allocate these more

16 efficiently, so that the tasks are allocated to the forum which

17 is going to be the quickest or the most effective for the

18 determination of those particular matters.  And so we propose

19 that certain tasks be allocated to the JOLs in Cayman and

20 certain tasks be allocated to Ms. Ball as Chapter 11 trustee.

21 And we sent back those proposals a few days ago to the JOLs and

22 their counsel at Morrison & Foerster and we've also shared

23 those counterproposals with our constituents a few days ago.

24 And so we are somewhere down the road of negotiating a protocol

25 that will hopefully meet the requirements that will best

1   maximize recoveries, will be speedy and will be effective and

2   will recognize comity between the two courts.

3            That's our aim.  We think we probably will get there

4   within the next week or two.  So, we're obviously keen that

5   Your Honor's judgment of 23rd February is -- sorry, 23rd of

6   January is recognized in terms of what you would expect the

7   protocol to cover and how it will best be constituted.  And we

8   hope to get there and we're making progress.

9            If you have any specific questions, I'm very happy to

10  answer them.

11           THE COURT:  That's sufficient for now.  Thank you, Mr.

12  Pearson.

13           I think, then, Ms. Buonome, I would ask you if you

14  have any further remarks.  I want to give other stakeholders a

15  chance to be heard.

16           MS. BUONOME:  Thank you, Your Honor.  I would just

17  like to add and emphasize the issues that the FILB plan

18  presents and the concern that the Chapter 11 trustee has with

19  respect to the impact on the Soundview estates.  As Your Honor

20  is --

21           THE COURT:  By that you mean the Soundview 11 trustee.

22           MS. BUONOME:  Correct, Your Honor, the Soundview 11

23  trustee.  And those issues require an in-depth analysis and the

24  trustee has a very short, three-week period to both object to

25  the FILB plan and provide carve-out language with respect to

1   release and injunction language proposed.  But before the

2   trustee can begin to analyze and provide that carve-out

3   language, she needs documents.  And at this stage, we need to

4   wait, pursuant to Mr. Davis' requests, to Ms. Midanek's

5   requests, and other parties, to issue the subpoenas from Your

6   Honor's 2004 order.  So, timing is troubling because the three

7   weeks gets much shorter when you bake in the ten-day period in

8   our proposed order which we felt was the minimum amount of --

9   the minimum period that could be reasonable under the governing

10   rules.

11         THE COURT:  If you're a stakeholder in the FILB case,

12   why do you need a court order from me?  Why don't you have your

13   subpoena rights, assuming you can't get anything by voluntary

14   compliance as a matter of contested matter discovery?

15         MS. BUONOME:  Oh, Your Honor, that's a great question.

16   With the subpoena, it was the subpoena that Ms. Ball would be

17   issuing to obtain documents from Ms. Midanek that she has

18   requested we serve her with before producing documents.

19         THE COURT:  Same question.

20         MS. OSTAD:  Your Honor?

21         THE COURT:  You don't need a 2004 order for contested

22   matter discovery.

23         MS. BUONOME:  Your Honor, to clarify, she would like

24   the uniform protective order that is also attached to the Rule

25   2004 order in which we've asked Your Honor to approve in

1    connection with the Rule 2004 motion.

2            THE COURT:  Midanek's unwilling to enter into a

3    protective order --

4            MS. BUONOME:  She would like to --

5            THE COURT:  -- by stip?

6            MS. BUONOME:  Pardon?

7            MS. OSTAD: Your Honor, may I ask a question?

8            THE COURT:  I would like to hear counsel one at a

9    time.  Forgive me.  Go ahead.

10           MS. OSTAD:  Sure.

11           MS. BUONOME:  Thank you.  Ms. Midanek has requested

12   that she would like to enter into a protective order prior to

13   providing documents to Ms. Ball, the Chapter 11 trustee.

14           THE COURT:  Yes, I understood that but my reaction to

15   that was shrug my shoulders; why isn't it more than entering

16   into a stip to accomplish that?  People do that all the time.

17           MS. BUONOME:  Well, that was the request that we had

18   received both from Ms. Midanek, as well as from Mr. Davis, the

19   Chapter 11 trustee of the FILB estates.

20           THE COURT:  Move on, please.

21           MS. BUONOME:  Sure.  And so, Your Honor, I would just

22   like to reiterate the fact that although Ms. Ball is

23   appreciative of the additional short extension that she's

24   received to analyze the FILB plan, it will be very tight

25   especially because the rollout of documents will also be

1  delayed and that will eat up a portion of the three-week

2  period.

3          And the trustee's keenly aware of certain issues

4  presented in the FILB plan that will predetermine rights of

5  stakeholders in the Soundview estates.  And specifically, Your

6  Honor, there's release language in the FILB plan.  There's an

7  injunction provision in the FILB plan and --

8          THE COURT:  After release, you said what?

9          MS. BUONOME:  Injunction, Your Honor.

10         THE COURT:  Um-hum.

11         MS. BUONOME:  Which we believe to hinder Ms. Corinne

12  Ball as the trustee from pursuing certain actions against

13  third-party, non-FILB debtor parties.  And so we're working

14  hard and we realize the three weeks is short and we're going to

15  do our very best to move forward and preserve the rights of

16  stakeholders in the Soundview cases.

17         THE COURT:  All right.

18         MS. BUONOME:  And our goal, of course, as we had

19  reached a consensus just yesterday with Mr. Luskin on an

20  extension, our goal, of course, is to reach a consensus and

21  consensually resolve the issues presented by the FILB plan.

22         THE COURT:  Okay.

23         MS. BUONOME:  Thank you, Your Honor.

24         THE COURT:  Thank you.

25         Who would like to be heard next?  Mr. Glenn?

1      MR. GLENN:  Thank you again, Your Honor.  I'm going to

2   be brief because I don't think it's appropriate at this stage

3   to talk about the discussions that are going on behind the

4   scenes but simply by way of context, this is a thirty million

5   dollar bankruptcy estate approximately as it now stands, as was

6   adduced in the evidentiary hearing that led to Ms. Ball's

7   appointment.

8      After the appointment, we saw fee applications from

9   the Porzio firm, from the other two financial advisors and the

10  Cayman Islands lawyers and the bill for the debtors' side of

11  the estate -- I haven't seen the JOLs' costs -- was something

12  approaching two million dollars.

13     So, I think at this point what led us to file that

14  letter was two things; number one, we had a deadline and number

15  two, we have concerns about costs that we are still seeking to

16  address.  If those concerns are addressed, then we might keep

17  the course that we're on now, but they haven't been addressed

18  yet and until they are, we're keeping all of our options open.

19     Certainly -- and I want to put this as publicly on the

20  record as possible, so there's no confusion at all -- the

21  decision to write that letter had absolutely nothing to do with

22  Ms. Ball's qualifications, certainly not the Jones Day firm's

23  qualifications, which as I've told Ms. Ball, are clearly

24  stellar.  But I have an obligation to my client to maximize

25  their recovery and to make sure that the administrative costs

1   of these estates are proportionate and appropriate relative to

2   their size.

3          In that connection, the protocol which delineates

4   whose responsibilities are what, will certainly go a long way

5   towards determining what administrative costs will be expended

6   here versus what administrative costs will be expended in the

7   Cayman Islands.  I look forward to more discussions in that

8   regard with Ms. Ball and her counsel and the JOLs and their

9   counsel.

10         Beyond that, I have nothing further to add at this

11  time unless Your Honor has questions for me.

12         THE COURT:  Very well, thank you.

13         MR. GLENN:  Thank you.

14         THE COURT:  Mr. Pintarelli, would you like to be heard

15  in any way?

16         MR. PINTARELLI:  Good morning, Your Honor.  John

17  Pintarelli from Morrison & Foerster for the JOLs.

18         As Your Honor stated in the bench decision, you expect

19  that the Chapter 11 trustee that was appointed to enter into a

20  protocol with the JOLs, Judge Smellie in the Cayman Islands has

21  also ordered the JOLs or directed the JOLs to enter into

22  appropriate order using Lancelot or any other appropriate

23  protocol that's out in the market to efficiently administer

24  these estates.

25         Throughout the last five months, we've had discussions

1  with the stakeholders in this case and it was apparent to us

2  that there were certain expectations that they believed certain

3  things should be done in the Cayman Islands and certain things

4  should be done in the U.S.  And we heard Your Honor's decision

5  very clearly that you expected an investigation to take place

6  in the U.S.  The Chapter 11 trustee is in a better position to

7  subpoena parties, depose parties and gather that information

8  with respect to the documents.

9          It's our view that there are certain expectations that

10  stakeholders had with regard to how their claims would be

11  adjudicated and how distributions would be made.

12          THE COURT:  I.e., under Cayman law?

13          MR. PINTARELLI:  I.e., under Cayman law.  We also

14  think that it would be more efficient and less costly rather

15  than filing a disclosure statement and a plan under U.S. law

16  but again, we're open to those discussions.  We received the

17  comments from the Jones Day firm and we suggested that the next

18  discussion take place with the stakeholders, so that we can

19  iron out those issues, get the protocol signed up and approved

20  by the Courts.  And we can move to administering the estate for

21  the benefit of the stakeholders.

22          THE COURT:  Very well.  Okay.  Thank you, Mr.

23  Pintarelli.

24          Ms. Freedman would you and/or Mr. Martin like to be

25  heard?

1          MS. FREEDMAN:  Is Mr. Martin still on the line?

2          THE COURT:  Mr. Martin, are you still with us?  It

3    looks like if anybody is going to speak on your constituency,

4    it's you Ms. Freedman.

5          MS. FREEDMAN:  I have nothing to add.

6          THE COURT:  Okay, very well.

7          Mr. Morrissey, I understand you might want to weigh in

8    somewhat.

9          MR. MORRISSEY:  Your Honor, very briefly, and just for

10   the record, Richard Morrissey for the U.S. Trustee.

11         Your Honor, since the U.S. Trustee appointed Ms. Ball

12   as Chapter 11 trustee and since that appointment was approved

13   by the Court, Ms. Ball, obviously, and her team have set right

14   to work under somewhat difficult constraints, both in terms of

15   cost and time.  We've had several discussions already and as

16   Mr. Glenn suggested, this case is not made of money and

17   administrative costs are very much, I think, in the forefront

18   of everyone's mind both in this case and in the FILB case, as

19   Mr. Luskin knows all too well.

20         And I'm glad to see that the two Chapter 11 trustees

21   are cooperating.  Your Honor should know, and I know Your Honor

22   does know, that Ms. Ball is off to a good head start with

23   respect to information on Soundview which was provided by the

24   Chapter 11 trustee in FILB in both private discussions and

25   information sharing, as well as the Chapter 11 trustee's report

1    in the FILB case.  So I think that should help speed up the

2    process.

3           As far as the trustee election issue, Your Honor, we

4    have been in discussions with various parties on that and as

5    Mr. Glenn suggested, those discussions are continuing and

6    hopefully some kind of a resolution can be worked out and the

7    U.S. Trustee obviously is fully aware of his role in that

8    process.

9           Your Honor, counsel mentioned the appeal but I don't

10   really  have a whole lot to say on the record about that but we

11   certainly are going to be addressing the issues raised there,

12   both in the designation of record and the merits of the appeal.

13          THE COURT:  Well, help me on that.  You said "we".  I

14   don't know if you were talking about the U.S. Trustee Program

15   or somebody else.  Nobody asked me for a stay.  So we still

16   have a trustee.  Likewise under the bankruptcy rule that

17   applies and I've forgotten its number, until and unless an

18   initially designated trustee has been replaced after a vote

19   supervised by the U.S. Trustee Program, that particular first

20   named trustee continues to act with full authority.

21          So, as I understand the 8000 series of the Federal

22   Rules of Bankruptcy Procedure, after one side designates the

23   record, the other adds any designations that are appropriate

24   and then it's docketed in the district court and the district

25   court does its thing.  But I would have thought that any

1   further action, unless a stay is entered, continues in this

2   court without interruption and the district court can do its

3   thing under the schedules that district courts do.  Am I

4   missing something?

5         MR. MORRISSEY:  Your Honor, I think you're missing

6   nothing.  I think everyone in the courtroom is fully in

7   agreement that Ms. Ball will continue to do her thing with

8   respect to this case, and, as Your Honor said, most

9   importantly, I think, there's no stay here.  So the role of the

10  trustee, I don't think, is even slowed down, let alone stopped,

11  by the notice of appeal.

12        THE COURT:  So pause, please, then, Mr. Morrissey.  Am

13  I correct that other than the fact that you are the guy who

14  made the motion that ultimately won, and you're going to watch

15  to see if the district court does something that could affect

16  what's already been done, the appeal is just going to take its

17  course, but until and unless it changes something we just

18  continue as we're going.

19        MR. MORRISSEY:  With respect to this case and the

20  trustee's role I think that's absolutely right.  We may take

21  certain actions regarding the appeal, because there -- my

22  understanding, Your Honor, is that there are certain issues

23  that the district court deals with in and of itself and certain

24  issues that must be raised by parties to the action.

25        THE COURT:  Oh, and you're the appellee in the appeal,

1    I guess.

2           MR. MORRISSEY:  Yes, Your Honor.  We're not the only

3    named party, however, Your Honor.

4           THE COURT:  Okay.  I assume, without telling you how

5    to do your job, that if and when the appellee is required to do

6    something in the district court your office will do it.

7           MR. MORRISSEY:  Yes.  But, again, we may not be the

8    only party who may do something.

9           THE COURT:  Okay.  Anything else, Mr. Morrissey?

10          MR. MORRISSEY:  Your Honor, with respect to the

11   retentions, we have been discussing the Jones Day retention,

12   and, as counsel mentioned, we haven't seen the others yet.  But

13   we do understand why they are holding those up, and we won't

14   use a nunc pro tunc against them, because they did notify us.

15          Obviously we certainly hope that there are no conflict

16   issues with respect to the financial advisor, the proposed

17   financial advisor in the case.

18          But we should have a resolution, I believe, with

19   respect to the Jones Day retention very soon.

20          THE COURT:  Okay.  Anything else?

21          MR. MORRISSEY:  No, Your Honor.

22          THE COURT:  All right.  Is there anybody who wanted to

23   be heard on case status who hasn't had that chance?

24          Mr. Luskin, come on up, please.

25          MR. LUSKIN:  Your Honor, on one point, and that's

1  discovery.  I want the Court first to be aware that with

2  respect to the FILB documents that are in our possession we

3  have made those available to the Soundview trustee and will

4  continue to do so without any further formality other than our

5  own agreement there that they will -- our meetings and

6  discussions are in the nature of settlement to resolve a

7  dispute, and, in some instances, we actually have a common

8  interest, so they would be covered by a common interest

9  privilege.  But there are no time restraints in that, and we

10  have exchanged documents and stand ready, willing, and able to

11  continue to provide more.

12        The non-FILB documents, that is the documents that the

13  Chapter 11 trustee obtained from third parties, are governed by

14  a master protective order in the FILB case that requires us to

15  give notice.  Well, actually it requires a requesting party to

16  serve us with a subpoena and us then to give notice to a

17  variety of parties or the producing party, principally

18  Fletcher.  I believe it calls for five days, five business

19  days' notice.  And given the need for speed here -- I know this

20  is procedurally unusual, but I would urge the Court, on my

21  current application, to reduce the period from five days to two

22  days by e-mail in order to facilitate any further discovery on

23  a more expedited basis under my order.

24        THE COURT:  So this would be a modification of your

25  order that --

1           MR. LUSKIN:  Yes.

2           THE COURT:  -- you've been acting under for a while.

3           MR. LUSKIN:  Yes.

4           THE COURT:  It gives parties who might be prejudiced

5    by your compliance with the subpoena the chance to raise an

6    objection?

7           MR. LUSKIN:  Yes.

8           THE COURT:  All right.  Stand by for a second.

9           Is there anybody on the call who is a party-in-

10   interest in the FILB case who would have an objection to that?

11          Ms. Freedman, you rose, but I gather that something

12   I've said caused you to sit down.  Come on up.  Tell me what's

13   bothering you.

14          MS. FREEDMAN:  Your Honor, Terri Jane Freedman, Porzio

15   Bromberg & Newman, on behalf of the debtors-out-of-possession.

16   We do not represent Mr. Fletcher individually.  However, Mr.

17   Fletcher is not here and should be at least given the

18   opportunity to be heard by this Court to the extent that Mr.

19   Luskin seeks to reduce the time frame from five days to two

20   days on notice in the event Mr. Fletcher would want to object.

21          THE COURT:  I think that's right, Ms. Freedman, but my

22   phone log shows Mr. Fletcher to be on the call.

23          Are you on the call, Mr. Fletcher?

24          MR. FLETCHER:  Yes, I am, Your Honor.

25          MS. FREEDMAN:  Okay.

1          THE COURT:  Do you want to be heard in opposition?

2          MR. FLETCHER:  No.  I have nothing to add.

3          THE COURT:  Not to that?

4          MR. FLETCHER:  Not to that, no.

5          THE COURT:  Okay.  Then I'm going to so order the

6    record, Mr. Luskin, but at your convenience --

7          MR. LUSKIN:  Thank you.

8          THE COURT:  -- paper the modification for me to issue

9    an amendatory written order.

10         MR. LUSKIN:  I will do that, Your Honor.

11         My final point, we're going to operate, or at least

12   the parties in this room are on notice that we will operate as

13   if it's a two-day notice.  We will submit a modification to

14   that order as soon as we possibly can.

15         The final point I wanted to make has been adverted to,

16   really, by everybody, and that is the need for speed.  I am not

17   going to put on the record the facts that really require us in

18   FILB to do everything that's humanly possible to confirm the

19   case before the end of March.  It has principally to do with

20   litigation concerns, and for obvious reasons I don't want to

21   put those on the record.

22         On the other hand, we're mindful of the fact that

23   Jones Day is relatively new in the case, and they have a lot of

24   work to do.  I would urge the Court to enter whatever discovery

25   orders are needed, allowing Jones Day -- allowing the Soundview

 1    Trustee to conduct expedited discovery.  I know that the order
 2    they've proposed is based on the existing FILB protective
 3    order.  I'm not aware that there are any major substantive
 4    changes.  And it really is -- we are in a position where time
 5    is of the essence.  It will be a disaster, and that is not too
 6    strong a word, for us in the FILB case if the Soundview Trustee
 7    is unable to do as good a job as can possibly be done in the
 8    next three weeks.  And I would really hate to see discovery be
 9    the thing that causes issues for us in FILB.

10              THE COURT:  All right.

11              MR. LUSKIN:  So to the extent -- I don't know whether
12    there are contested proceedings in Soundview.  In FILB we have
13    contested matters because we've objected -- the trustee's
14    objected to proofs of claim.  We've objected to the Soundview
15    proofs of claim.  There's a contested matter.  There's no issue
16    with respect to discovery as between the Soundview trustee and
17    the FILB trustee.  But we're not the only party here, and I
18    would just urge the Court to allow the Soundview trustee to
19    issue subpoenas, to put into place the existing protective
20    order in FILB and just modify it for Soundview, to do it on
21    short notice, not put in five business days but make it two
22    business days to allow for expedited resolution of disputes.
23    It really is in the best interests, I believe, not only of the
24    FILB estate but also of the Soundview estate.

25              I know it's not my motion, but I am really in favor of

 1  it, so thank you, Your Honor.

 2            THE COURT:  All right.  Yes?

 3            MS. BUONOME:  Your Honor, I'd just like to add --

 4            THE COURT:  Ms. Buonome.

 5            MS. BUONOME:  -- two more points to piggyback on what

 6  Mr. Luskin mentioned in his urging the Rule 2004 motion to

 7  proceed on an expedited basis.  And the beauty of the 2004

 8  process is there's no need for the cost and time expense of an

 9  associated contested matter.  And, as we mentioned, the

10  trustee, Ms. Ball --

11            THE COURT:  No, I don't follow that at all, Ms.

12  Buonome.  Contested matter discovery is much more efficient

13  than Rule 2004 discovery, and it's not subject to the pending

14  proceeding rule.

15            MS. BUONOME:  Understand, Your Honor.  But with a

16  caveat, I guess, to our 2004 request in that we're just

17  targeted in getting the documents that Mr. Davis has collected

18  already from third parties, and it's not a fishing expedition

19  in the normal sense of a Rule 2004 request, Your Honor.  So

20  it's targeted and focused, and we have particular parties, Mr.

21  Davis, Ms. Midanek, and a few others that have agreed to turn

22  over documents, to produce documents.

23            THE COURT:  Okay.

24            MS. BUONOME:  And then just three housekeeping cleanup

25  points.  Our monthly operating reports for the debtors, we've

1    been in communication with the United States Trustee program

2    and have agreed that the first MOR will be filed --

3              THE COURT:  Forgive me, Ms. Buonome.  I think this may

4    be the first time you've appeared before me.

5              MS. BUONOME:  Sure.

6              THE COURT:  I hate acronyms.  I don't speak acronym.

7              MS. BUONOME:  I'm sorry.  I'm sorry, Your Honor.  The

8    first monthly operating report will be filed on March 20, 2014

9    for January, 2014.  And then we'll file monthly operating

10   reports on the 20th of each month.

11             In addition, we need to file two catch-up monthly

12   operating reports, for September, 2013 and the fourth quarter

13   of 2013.  And we've been in consultation with Mr. John Sagrado

14   (ph.) at the United States Trustee program on this point.

15             THE COURT:  Okay.

16             MS. BUONOME:  That's the first housekeeping point.

17   The second housekeeping point is the schedules and statements.

18   I'm sure Your Honor may recall from the evidentiary hearing

19   that CohnReznick inherited what we understand to be very

20   minimal financial records from the debtors.

21             Indeed, as Your Honor mentioned in your bench decision

22   on January 23rd, I believe the debtors had not produced audited

23   financials for the past five years.

24             As it relates to schedules and statements, our

25   proposed financial advisors have been in consultation with the

1   debtor's financial advisors at CohnReznick and understand that

2   the schedules and statements need to start from scratch.  And

3   so we are prepared to do so and wanted to advise Your Honor on

4   that front.

5        And the final housekeeping matter is -- round out the

6   three -- is that the trustee has obtained a bond, and she sent

7   that bond to the United States Trustee program on February 12,

8   2014.

9        THE COURT:  Okay.

10       MS. BUONOME:  That's all, Your Honor.

11       THE COURT:  All right.

12       MS. BUONOME:  Thank you very much.

13       THE COURT:  All right.  I want to bundle up everything

14   in both cases.  Is there anybody who wanted to be heard on the

15   2004 application who hasn't had a chance to be heard?  Hearing

16   no response.

17       All right.  Here's what we're going to do, folks, both

18   on case management and on the 2004.  First, in terms of case

19   management, subject to one thing, which I'll mention in a

20   moment, I'm satisfied with the progress of the case and the way

21   it's been conducted.  I do note, of course, there is no stay of

22   the order that authorized the U.S. Trustee program to appoint a

23   trustee, and there's been no appeal from the order appointing

24   the trustee.  The trustee continues to act as I indicated in

25   earlier colloquy.

1          The one concern I had is one that had troubled me

2    before Mr. Glenn and Mr. Morrissey had mentioned the point,

3    that this is a thirty million dollar case.  Without

4    understating the importance of the issues to the stakeholders

5    involved, this is a small leaven by the standards of this

6    Court.  It's a very small leaven.  It barely -- it's kind of

7    like a mid-market case and may be, without disrespect to mid-

8    market cases.

9          The 2004 application showed four lawyers on the

10   application.  The person who's been the principal spokesman --

11   spokeswoman -- spokesperson today is still another lawyer.  And

12   I heard of the presence of two more in London.

13         The use of resources in that way is not an impediment

14   to retention, but it's an impediment to getting paid for so

15   many professionals.  But, more importantly, the use of so many

16   people can, and often does, cause confusion, as it did when,

17   for instance, I had two Jones Day lawyers on the phone to my

18   chambers at the exact same time, neither of whom knew about the

19   other being on the call to chambers.  And if the law firm wants

20   to be paid for its work, which most firms like to do and expect

21   to be paid, if the management of this case continues without a

22   change in the trustee we've got to do better, so I'm not in the

23   position where I have to do something which I really hate to

24   do, which is to employ the judge's responsibility to review fee

25   requests.

1          It's far better not to do the work in the first place

2     and to manage the matter as if it is a thirty-million-dollar

3     case.  And that, of course, would also involve delegating to --

4     that's an unfair word, because it understates the role of the

5     JPLs -- but giving the JPLs responsibility over a matter that

6     can be done more efficiently than can be done in the U.S. or

7     the way people envision it.  So I'm not issuing any rulings

8     now, but I do need to ask people to do a stop, look, and listen

9     on that issue.

10          The Rule 2004 motion exemplifies some of the concerns

11     that I have.  To the extent that the Soundview trustee needs to

12     be heard in the Fletcher International, Ltd. of Bermuda case,

13     which we refer to as FILB, that goes without saying.  But if

14     that involves inappropriate releases, any objections to

15     confirmation, that's a matter to which the Soundview trustee

16     has rights to engage in discovery as a matter of right under

17     the contested matter rules, because, as you know, Rule 9014

18     embodies and incorporates by reference Rules 26 through 37.

19     That means you don't need a court order from me to ask Mr.

20     Luskin for anything or even to subpoena people if you need it

21     in Mr. Luskin's case.  By the same token, the pending

22     proceeding rule impairs the ability to use Rule 2004 on

23     contested matters and especially in litigation in which

24     discovery is already ongoing.

25          So I'm going to approve the 2004 order, but that's

1   only because all the work in asking for it's already been done.

2   And I'm going to use it or authorize it for the purpose of

3   discovery in any matters other than the FILB case, because it's

4   already available in the FILB case, the right to engage in that

5   discovery.

6          Now apropos that, I need people read and understand

7   what I've written in the case management orders that I've

8   entered in each of the FILB and Soundview cases, which provide

9   that expedited discovery is authorized without permission of

10  the Court.  As soon as a motion is filed -- you don't even need

11  an objection -- you have that right to discovery.  So use that

12  right.  Issue your subpoenas if you need to, although I can't

13  imagine in a thousand years why you'd need to subpoena Mr.

14  Luskin, other than as a matter of form to comply with any

15  duties he has to the third world.

16         If you need to broaden or change a confidentiality

17  stip or consent order or order that I previously entered,

18  negotiate out what you need, which because we have templates in

19  the area should be able to be done in about an hour per stip or

20  less, and get the flow of information going.

21         And I want stuff in this case done by phone call.

22  When I say phone call, I don't even mean e-mail.  If you need

23  to confirm what was agreed to in a phone call then you can send

24  an e-mail or, if you really want to, a letter.  But I want

25  people talking to each other in this case, and I want people --

1   in this case I should say the Soundview and the FILB cases.  I

2   want these cases moving more quickly and more cheaply.

3          I don't want to understate the legitimate needs and

4   concerns of the stakeholders in this case or its complexity.

5   But the best way to deal with that is to put our energy and

6   time on the stuff that needs to be done and to avoid the stuff

7   that doesn't need to be done.

8          Do we have any further business?  Hearing none,

9   everybody who was here on FILB and Soundview is excused, and

10  we're going to go right into WineCare without a break.

11         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

12         THE COURT:  Pause, folks.  Do I need to do anything in

13  open court on the recognitions for Leveraged and Arbitrage?  My

14  tentative, subject to people's rights to be heard, is to grant

15  them without argument.

16         Mr. Brock, you want to come up to a mic, please?

17         MR. BROCK:  Thank you, Your Honor.  I would hope that

18  we could escape with doing nothing in court today, Your Honor.

19  There is an objection filed by Mr. Turner.  He objected saying

20  that one of our exhibits was incomplete, and then he added in

21  his objection the omission --

22         THE COURT:  His account of the world.

23         MR. BROCK:  Correct.

24         THE COURT:  Mr. Turner, that is not a legally

25  cognizable objection on a motion of this character.  Unless you

1   come up with something else I'm granting the motion.

2           MR. TURNER:  No objection.  I was just hoping to be

3   heard in full with --

4           THE COURT:  Okay.

5           MR. TURNER:  -- my representations.

6           And one other point, if possible.  I'm hoping -- and

7   I'm not an attorney, as you know -- that with the Chapter 15

8   there had been in process but for lack of money there had --

9   the appeal in regard to the FIA Leveraged case was not made to

10  the Privy Council for lack of money.  Now that the Wilmington

11  Trust money has been freed for Soundview and for the Richcourt

12  funds -- Soundview meaning Ms. Ball, the Richcourt funds

13  meaning Ms. Midanek -- I haven't spoken to them, but I'm

14  optimistic someone, either of them may look to proceed with an

15  appeal.  Maybe it could even be heard in the U.S.  But, as I

16  said, I'm not an attorney, and I don't know if that's even

17  possible.

18          THE COURT:  The issue before me today is Chapter 15

19  recognition, and I'm granting that.

20          One of the concepts I had when I authorized the money

21  to be transferred from Wilmington Trust, which was a critically

22  important predicate, was that that money wouldn't be touched

23  without judicial supervision, which, at this point, is me.  If

24  you think there is a basis for touching that money for dealing

25  with something else you're going to have to make an application

SOUNDVIEW ELITE LTD, ET AL.; FLETCHER                    52

1  to me.  Not today.  In writing, with an opportunity for people

2  who have a different view of the world to be heard.

3          But I got to tell you, Mr. Turner, that my concept

4  when I authorized that money to be transferred from Wilmington

5  Trust to my judicial supervision was that it wouldn't be messed

6  around with without me approving it.

7          MR. TURNER:  I understand, Your Honor.

8          THE COURT:  Okay.  Thank you, folks.

9          MR. TURNER:  Thank you.

10         MR. BROCK:  Your Honor?

11         THE COURT:  Come on up, please, Mr. Brock, to a mic,

12  if you would.

13         MR. BROCK:  Your Honor, I just recalled that I was

14  going to advise the Court that the proposed orders that we will

15  be submitting to Your Honor will have one revision, and that is

16  to make explicit that we would have relief, pursuant to the

17  recognition order, that would permit the JOLs to take the

18  dividends that we hope will be paid under the FILB Chapter 11

19  plan and distribute those -- bring those monies down to the

20  Cayman proceedings and distribute them from that jurisdiction.

21  That's 1520 --

22         THE COURT:  I would have thought you would have had

23  that right without saying it in baby talk, but if you want it

24  for the avoidance of doubt, include it, sure.

25         MR. BROCK:  Okay.  Thank you, Your Honor.

1            THE COURT:  Okay.  Okay.  Now everybody who was here

2    on Soundview and Fletcher International can leave and let's

3    hear WineCare.

4            (Whereupon these proceedings were concluded at 11:54 AM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                   I N D E X

3

4                                   RULINGS

5                                                   Page      Line

6   Motion for FILB extending voting and            14        14

7   objection deadline will be granted.

8   Notice period for non-FILB documents            42         5

9   reduced from five days to two days

10  Motion for 2004 discovery granted               48        25

11  Chapter 15 recognition is granted               51        19

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                         C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10

11   _____

     PENINA WOLICKI

12
     AAERT Certified Electronic Transcriber CET**D-569

13

14
     eScribers

15
     700 West 192nd Street, Suite #607

16
     New York, NY 10040

17

18
     Date:  February 26, 2014

19

20

21

22

23

24

25